**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JIM ALEX, MARK BOWERS, BOYCE BROWN, STEVEN CHECCHIA, NORMAN CLARK, RICHARD FUNDERBURK, ADELLA GONZALEZ, CHRISTOPHER HORTON, and DONAVON THOMPSON, on Behalf of Themselves and All Others Similarly Situated, | Case No.: |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | **DEMAND FOR JURY TRIAL** |
| NFL ENTERPRISES, LLC and NATIONAL FOOTBALL LEAGUE, | |
| Defendants. | |

Plaintiffs Jim Alex, Mark Bowers, Boyce Brown, Steven Checchia, Norman Clark, Richard Funderburk, Adella Gonzalez, Christopher Horton, and Donavon Thompson ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this class action complaint against Defendants NFL Enterprises, LLC and National Football League (collectively "NFL" or "Defendants"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of all persons who subscribed to official NFL Team Websites[1] operated by or based on Defendants' guidelines, coding, and content.[2]

2.      The Team Websites provide users with access to video content related to the NFL and the Member Teams, including prerecorded clips of games, interviews with players and team staff, sports analysts, and more.

3.      On the Team Websites, Defendants offer the option for users to subscribe to the team's newsletter.  Subscribers are given updates regarding the Member Teams and content on the Team Websites in exchange for their contact information.

4.      Defendants do not disclose on the Team Websites, however, that subscribers' personal identifying information would be captured by tracking methods utilized by Defendants (referred to as the "Tracking Methods," discussed and defined herein), and then transferred to Facebook.

5.      Data sharing policies for a service or subscription is an important factor for individuals deciding whether to provide personal information to that service.

---

[1] Upon information and belief, the Team Websites at issue include: www.azcardinals.com, www.atlantafalcons.com, www.baltimoreravens.com, www.buffalobills.com, www.panthers.com, www.chicagobears.com, www.bengals.com, www.clevelandbrowns.com, www.dallascowboys.com, www.denverbroncos.com, www.detroitlions.com, www.packers.com, www.houstontexans.com, www.colts.com, www.jaguars.com, www.chiefs.com, www.raiders.com, www.chargers.com, www.therams.com, www.miamidolphins.com, www.vikings.com, www.patriots.com, www.neworleanssaints.com, www.giants.com, www.newyorkjets.com, www.philadelphiaeagles.com, www.steelers.com, www.49ers.com, www.seahawks.com, www.buccaneers.com, www.tennesseetitans.com, www.commanders.com (collectively, "Team Websites") (the teams are collectively referred to as "Member Teams").

[2] "[B]ecause each team is a member of the NFL, the layouts of their websites are similar in adhering to NFL regulations and guidelines." *See* Echevarria, R. M. (2017). *A Content Analysis of NFL Team Online Branding*. ELON JOURNAL OF UNDERGRADUATE RESEARCH IN COMMUNICATIONS, *8*(2), 96-104 (available at https://eloncdn.blob.core.windows.net/eu3/sites/153/2017/12/10_NFL_Echevarria.pdf).

6.      Congress has recognized the potential harm caused by associating a person's personally identifiable information in conjunction with their video watching.

7.      Congress, therefore, passed the Video Privacy Protection Act ("VPPA"), prohibiting video tape service providers,[3] such as Defendants, from sharing personally identifiable information ("PII") tied to the title, description, or subject matter of prerecorded audio video material[4] (the "Video Watching Data") without valid consent.[5]

8.      Defendants have implemented and utilized the Tracking Methods which track user activity on the Team Websites and disclose that information to Facebook. In other words, the Defendants cause users' PII and Video Watching Data to be shared with Facebook, in violation of the VPPA

9.      Defendants do not seek and have not obtained consent from users or subscribers to utilize the Tracking Methods to track, share, and exchange their PII and Video Watching Data with Facebook.

10.      Defendants knew that their Tracking Methods resulted in VPPA violations, and that they failed to obtain users' consent to allow their Tracking Methods to operate in a way that shares users' information with Facebook.

11.      Subscribers of the Team Websites have been harmed as a result of Defendants' violations of the VPPA.  In addition to monetary damages, Plaintiffs seek injunctive relief requiring Defendants to immediately (i) remove the Tracking Methods from the Team Websites or (ii) add, and obtain, the appropriate consent from subscribers.

---

[3] 18 USC 2710(a)(4).
[4] 18 USC 2710(b)(2)(D)(II).
[5] 18 USC 2710.

12.     Plaintiffs' claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons.  Plaintiffs seek relief in this action individually and on behalf of subscribers of the Team Websites for violations of the VPPA, 18 U.S.C. 2710.

## PARTIES

13.     Plaintiff Jim Alex is a resident of California.  In or around the year 2000, Mr. Alex subscribed to NFL's and Las Vegas Raiders' (then the Oakland Raiders) newsletters.  During the sign-up process, Mr. Alex was never asked for consent to share his information as a result of Defendants' Tracking Methods.  Mr. Alex subsequently watched prerecorded video content on the Raiders Website using a device that was signed into Facebook, as recently as August 20, 2022, resulting in Mr. Alex's PII and Video Watching Data being shared with Facebook.  Mr. Alex's Facebook profile included personally identifiable information. On September 12, 2022, Mr. Alex served the National Football League, as well as the Las Vegas Raiders, with pre-suit notice of the VPPA violations alleged herein.

14.     Plaintiff Mark Bowers is a resident of Delaware.  In or around the year 2018, Mr. Bowers subscribed to the NFL's and Baltimore Ravens' website to obtain newsletters.  During the sign-up process, Mr. Bowers was never asked for consent to share his information as a result of Defendants' Tracking Methods.  Mr. Bowers subsequently watched prerecorded video content on the Ravens Website using a device that was signed into Facebook, as recently as August of 2022, resulting in Mr. Bowers' PII and Video Watching Data being shared with Facebook. Mr. Bowers' Facebook profile included personally identifiable information. On October 21, 2022, Mr. Bowers served the National Football League, as well as the Baltimore Ravens, with pre-suit notice of the VPPA violations alleged herein.

15.     Plaintiff Boyce Brown is a resident of Nebraska.  In or around the year 2010, Mr. Brown subscribed to the NFL's and Denver Broncos' website to obtain newsletters.  During the sign-up process, Mr. Brown was never asked for consent to share his information as a result of Defendants' Tracking Methods.  Mr. Brown subsequently watched prerecorded video content on the Broncos Website using a device that was signed into Facebook, resulting in Mr. Brown's PII and Video Watching Data being shared with Facebook. Mr. Brown's Facebook profile included personally identifiable information. On August 23, 2022, Mr. Brown served the National Football League, as well as the Denver Broncos, with pre-suit notice of the VPPA violations alleged herein. On September 14, 2022, the National Football League responded to Mr. Brown's letter.

16.     Plaintiff Steven Checchia is a resident of Pennsylvania.  In or around the year 2016, Mr. Checchia subscribed to the NFL's and New Orleans Saints' website to obtain newsletters.  In or around the year 2019, Mr. Checchia subscribed to the NFL's and Philadelphia Eagles' website to obtain newsletters.  During the sign-up process for the Saints' and Eagles' newsletters, Mr. Checchia was never asked for consent to share his information as a result of Defendants' Tracking Methods.  Mr. Checchia subsequently watched prerecorded video content on the Eagles and the Saints Websites using a device that was signed into Facebook, as recently as August of 2022, resulting in Mr. Checchia's PII and Video Watching Data being shared with Facebook. Mr. Checchia's Facebook profile included personally identifiable information. August 10, 2022, Mr. Checchia served the National Football League, as well as the New Orleans Saints, with pre-suit notice of the VPPA violations alleged herein. On August 22, 2022, Mr Checchia served the National Football League and the Philadelphia Eagles, with pre-suit notice of the VPPA violations alleged herein. On September 14, 2022, the National Football League responded to Mr. Checchia's letters.

5

17.      Plaintiff Norman Clark is a resident of Rhode Island.  Between the years 2017 and 2018, Mr. Clark subscribed to the NFL's and New England Patriots' website to obtain newsletters. During the sign-up process, Mr. Clark was never asked for consent to share his information as a result of Defendants' Tracking Methods.  Mr. Clark subsequently watched prerecorded video content on the Patriots Website using a device that was signed into Facebook, as recently as September of 2022, resulting in Mr. Clark's PII and Video Watching Data being shared with Facebook. Mr. Clark's Facebook profile included personally identifiable information. On September 21, 2022, Mr. Clark served the National Football League, as well as the New England Patriots, with pre-suit notice of the VPPA violations alleged herein.

18.      Plaintiff Richard Funderburk is a resident of South Carolina.  In or around the year 2014, Mr. Funderburk subscribed to the NFL's and Carolina Panthers' website to obtain newsletters.  In or around the year 2014, Mr. Funderburk subscribed to the NFL's and San Francisco 49ers' website to obtain newsletters.  In or around the year 2018, Mr. Funderburk subscribed to the NFL's and Denver Broncos' website to obtain newsletters.  During the sign-up process for the 49ers', Panthers', and Broncos' newsletters, Mr. Funderburk was never asked for consent to share his information as a result of Defendants' Tracking Methods.  Mr. Funderburk subsequently watched prerecorded video content on the Panthers' Team Website using a device that was signed into Facebook, as recently as August of 2022, resulting in Mr. Funderburk's PII and Video Watching Data being shared with Facebook.  Mr. Funderburk also subsequently watched prerecorded video content on the 49ers Website using a device that was signed into Facebook, as recently as July of 2021, resulting in Mr. Funderburk's PII and Video Watching Data being shared with Facebook. Finally, Mr. Funderburk has also watched prerecorded video content on the Broncos' Team Website using a device that was signed into Facebook, resulting

6

in Mr. Funderburk's PII and Video Watching Data being shared with Facebook. Mr. Funderburk's Facebook profile included personally identifiable information. On August 23, 2022, Mr. Funderburk served the National Football League, as well as the Denver Broncos, with pre-suit notice of the VPPA violations alleged herein. On September 12, 2022, Mr. Funderburk served the National Football League, the Carolina Panthers and the San Francisco 49ers with pre-suit notice of the VPPA violations alleged herein. On September 14, 2022, the National Football League responded to Mr. Funderburk's August 23, 2022 letter.

19.     Plaintiff Adella Gonzalez is a resident of Louisiana. In April of 2011, Ms. Gonzalez subscribed to the NFL's and New Orleans Saints' website to obtain newsletters. During the sign-up process, Ms. Gonzalez was never asked for consent to share her information as a result of Defendants' Tracking Methods. Ms. Gonzalez subsequently watched prerecorded video content on the Saints Website using a device that was signed into Facebook, as recently as July of 2022, resulting in Ms. Gonzalez's PII and Video Watching Data being shared with Facebook. Ms. Gonzalez's Facebook profile included personally identifiable information. On August 10, 2022, Ms. Gonzalez served the National Football League, as well as the New Orleans Saints, with pre-suit notice of the VPPA violations alleged herein. On September 14, 2022, the National Football League responded to Ms. Gonzalez's letter.

20.     Plaintiff Christopher Horton is a resident of Ohio. In or around 2018, Mr. Horton subscribed to the NFL's and Cleveland Browns' website to obtain newsletters. During the sign-up process, Mr. Horton was never asked for consent to share his information as a result of Defendants' Tracking Methods. Mr. Horton subsequently watched prerecorded video content on the Browns Website using a device that was signed into Facebook, as recently as August of 2022, resulting in Mr. Horton's PII and Video Watching Data being shared with Facebook. Mr. Horton's

Facebook profile included personally identifiable information. On August 12, 2022, Mr. Horton served the National Football League, as well as the Cleveland Browns, with pre-suit notice of the VPPA violations alleged herein. On September 14, 2022, the National Football League responded to Mr. Horton's letter.

21.     Plaintiff Donavon Thompson is a resident of Washington.  In or around the year 2018, Mr. Thompson subscribed to the NFL's and San Francisco 49ers' website to obtain newsletters.  During the sign-up process for the 49ers' newsletter, Mr. Thompson was never asked for consent to share his information as a result of Defendants' Tracking Methods.  Mr. Thompson subsequently watched prerecorded video content on the 49ers Website using a device that was signed into Facebook, as recently as September of 2022, resulting in Mr. Thompson's PII and Video Watching Data being shared with Facebook. Mr. Thompson's Facebook profile included personally identifiable information. On September 12, 2022, Mr. Thompson served the National Football League, as well as the San Francisco 49ers, with pre-suit notice of the VPPA violations alleged herein.

22.     Defendant NFL Enterprises, LLC is a Delaware limited liability company with its principal place of business in New York, New York.  Defendant NFL Enterprises, LLC operates and promotes professional and semiprofessional clubs and events, including through the development of websites and mobile apps.

23.     Defendant National Football League is a private corporation headquartered in New York, New York.  Defendant National Football League is comprised of 32 US-based franchises. It is considered a private trade organization, made up of 32 independent corporations – its teams. In addition to its own website, www.nfl.com, 32 independent team sites cater to fans and visitors of the particular team site (e.g., www.panthers.com; www.commanders.com;

www.baltimoreravens.com), utilizing content derived and hosted by the NFL.  The NFL along with each team offers guests of the site the option to sign-up for a team newsletter.  The Team Websites also offer a selection of viewable media, including pre-recorded videos.  The Team Websites have utilized Tracking Methods that allows the NFL to transmit subscribers' identifiable information, without the consent of subscriber-users, from the Team Websites to Facebook.

24.     Non-party Baltimore Ravens is legally registered as Baltimore Ravens Limited Partnership in Maryland, with its principal place of business in Owings Mills, Maryland.  It manages and promotes the Ravens professional football team participating within the NFL.  As a part of managing the professional football team, the Ravens have a team website (www.baltimoreravens.com) which, in addition to offering visitors the option to subscribe to a team newsletter, offers streaming audio-visual media, articles, and merchandise sales.  The content and coding for the team's website stems from the NFL and, in fact, the pre-recorded video content on the Ravens website – which is the subject of the VPPA violations at issue in this litigation – is originated and hosted by the NFL.

25.     Non-party Carolina Panthers is legally registered as Panther Football, LLC in North Carolina, with its principal place of business in Charlotte, North Carolina.  It manages and promotes the Panthers professional football team participating within the NFL.  As a part of managing the professional football team, the Panthers have a team website (www.panthers.com) which, in addition to offering visitors the option to subscribe to a team newsletter, offers streaming audio-visual media, articles, and merchandise sales.  The content and coding for the team's website stems from the NFL and, in fact, the pre-recorded video content on the Panthers website – which is the subject of the VPPA violations at issue in this litigation – is originated and hosted by the NFL.

26.     Non-party Cleveland Browns is legally registered as Cleveland Browns Football Company LLC in Delaware, with its principal place of business in Ohio.  It manages and promotes the Browns professional football team participating within the NFL.  As a part of managing the professional football team, the Browns have a team website (www.clevelandbrowns.com) which, in addition to offering visitors the option to subscribe to a team newsletter, offers streaming audio-visual media, articles, and merchandise sales.  The content and coding for the team's website stems from the NFL and, in fact, the pre-recorded video content on the Browns website – which is the subject of the VPPA violations at issue in this litigation – is originated and hosted by the NFL.

27.     Non-party Denver Broncos is legally registered as Denver Broncos Team, LLC in Delaware, with its principal place of business in Englewood, Colorado.  It manages and promotes the Broncos professional football team participating within the NFL.  As a part of managing the professional football team, the Broncos have a team website (www.denverbroncos.com) which, in addition to offering visitors the option to subscribe to a team newsletter, offers streaming audio-visual media, articles, and merchandise sales.  The content and coding for the team's website stems from the NFL and, in fact, the pre-recorded video content on the Broncos website – which is the subject of the VPPA violations at issue in this litigation – is originated and hosted by the NFL.

28.     Non-party Las Vegas Raiders is legally registered as Raiders Football Club, LLC in Nevada, with its principal place of business in Henderson, Nevada.  It manages and promotes the Raiders professional football team participating within the NFL.  As a part of managing the professional football team, the Raiders have a team website (www.raiders.com) which, in addition to offering visitors the option to subscribe to a team newsletter, offers streaming audio-visual

media, articles, and merchandise sales.  The content and coding for the team's website stems from the NFL and, in fact, the pre-recorded video content on the Raiders website – which is the subject of the VPPA violations at issue in this litigation – is originated and hosted by the NFL.

29.     Non-party New England Patriots is legally registered as New England Patriots Football Club, Inc. in Massachusetts, with its principal place of business in Foxborough, Massachusetts.  It manages and promotes the Patriots professional football team participating within the NFL.  As a part of managing the professional football team, the Patriots have a team website (www.patriots.com) which, in addition to offering visitors the option to subscribe to a team newsletter, offers streaming audio-visual media, articles, and merchandise sales.  The content and coding for the team's website stems from the NFL and, in fact, the pre-recorded video content on the Patriots website – which is the subject of the VPPA violations at issue in this litigation – is originated and hosted by the NFL.

30.     Non-party New Orleans Saints is legally registered as New Orleans Louisiana Saints, LLC in Delaware, with its principal place of business in Metairie, Louisiana.  It manages and promotes the Saints professional football team participating within the NFL.  As a part of managing the professional football team, the Saints have a team website (www.neworleanssaints.com) which, in addition to offering visitors the option to subscribe to a team newsletter, offers streaming audio-visual media, articles, and merchandise sales.  The content and coding for the team's website stems from the NFL and, in fact, the pre-recorded video content on the Saints website – which is the subject of the VPPA violations at issue in this litigation – is originated and hosted by the NFL.

31.     Non-party Philadelphia Eagles is legally registered as Philadelphia Eagles Football Club, Inc. in Delaware, with its principal place of business in Philadelphia, Pennsylvania.  It

manages and promotes the Eagles professional football team participating within the NFL. As a part of managing the professional football team, the Eagles have a team website (www.philadelphiaeagles.com) which, in addition to offering visitors the option to subscribe to a team newsletter, offers streaming audio-visual media, articles, and merchandise sales. The content and coding for the team's website stems from the NFL and, in fact, the pre-recorded video content on the Eagles website – which is the subject of the VPPA violations at issue in this litigation – is originated and hosted by the NFL.

32.     Non-party San Francisco 49ers is legally registered as Forty Niners Football Company LLC in Delaware, with its principal place of business in Santa Clara, California. It manages and promotes the 49ers professional football team participating within the NFL. As a part of managing the professional football team, the 49ers have a team website (www.49ers.com) which, in addition to offering visitors the option to subscribe to a team newsletter, offers streaming audio-visual media, articles, and merchandise sales. The content and coding for the team's website stems from the NFL and, in fact, the pre-recorded video content on the 49ers website – which is the subject of the VPPA violations at issue in this litigation – is originated and hosted by the NFL.

## JURISDICTION AND VENUE

33.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class member is a citizen of a state different from at least one Defendant.

34.     This Court has personal jurisdiction over Defendants because Defendants' principal place of business is in the state of New York.

35.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants'

principal place of business is located in this District and Defendants conduct substantial business

operations in this District. In connection with the Team Websites, the video content, hosting of

media accessible to subscribers, and associated coding, all originate and arise out of the

Defendants' business operations in this District.

### COMMON FACTUAL ALLEGATIONS

A.     **Background of the Video Privacy Protection Act**

36.     The VPPA regulates the disclosure of information about consumers' consumption

of video content, imposing specific requirements to obtain consumers' consent to such disclosure.

Under the statute, for each violation of the statute, a court may award actual damages (but not

less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and

attorney's fees.

37.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to

any person, personally identifiable information concerning any consumer of such provider." 18

U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information

which identifies a person as having requested or obtained specific video materials or services

from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any

person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or

delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. §

2710(a)(4). The VPPA was initially passed in 1988 for the purpose of protecting the privacy of

individuals' video rental, purchase and viewing data.

38.     In 1988, Senators were particularly troubled by disclosures of records that reveal

consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick

Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

39.     In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

40.     During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy stated that "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[6]

41.     Defendants here are video service providers in that they provided pre-recorded audio visual materials to Plaintiffs and Class members on their own site (nfl.com) and on the Team Websites.

42.     The relationship between Plaintiffs and Defendants is precisely the type of relationship contemplated by the VPPA.

_____

[6] See Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, https://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewerprivacy-in-the-21st-century (last visited Sept. 02, 2022).

43.     In this case, Defendants knowingly and systematically disclosed Plaintiffs' personal viewing information to Facebook, without obtaining their consent.

**B.      The NFL Utilizes Facebook Tracking Methods to Gather and Transmit PII and Video Watching Data**

44.     Facebook provides tools for web developers to utilize to monitor user interactions on their websites, which can then be shared with Facebook (e.g., the Tracking Methods).

45.     The primary purpose of the Tracking Methods, regardless of which, is the same: to gather, collect and then share user information with Facebook.  Examples of Tracking Methods include the Facebook Software Development Kit ("SDK") and Facebook Pixel, both[7] of which are available to web developers for the purposes sharing user activity with third-parties.

46.     Web developers can use the Tracking Methods to share both user activity and user identity with Facebook.

47.     When a Facebook user logs onto Facebook, a "c_user" cookie – which contains a user's non-encrypted Facebook User ID number ("UID") – is automatically created and stored on the user's device for up to a year.[8]

48.     A Facebook UID can be used, by anyone, to easily identify a Facebook user.  Once the Tracking Methods' routine exchange of information is complete, the UID that becomes available can be used by any individual to easily identify a Facebook user, by simply appending

---

[7] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. (https://developers.facebook.com/docs/meta-pixel/).   The Facebook SDK allows websites to access Facebook's social media features and login process, allowing for developers to verify a user's Facebook login status, log users into Facebook when requested, access the Graph API (https://developers.facebook.com/docs/javascript/quickstart/) and deliver user information to the Facebook platform (https://developers.facebook.com/docs/graph-api/overview).

[8] *Cookies & other storage technologies*, FACEBOOK https://www.facebook.com/policy/cookies/ (last visited October 27, 2022).

the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]).  That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

     **a.**     <u>**Facebook SDK as a Tracking Method**</u>

49.     The Facebook SDK is a flexible toolset that can be used to verify whether a user is logged into Facebook.

50.     The current version of the SDK is named "joey."[9]

51.     The presence of the SDK can be verified where the request URL sent from a website to Facebook includes the parameter "sdk=joey" in a request made to Facebook.

52.     The Member Teams use Facebook's SDK to verify whether a user is logged into Facebook.

53.     Each time a user visits a website utilizing the Facebook SDK to verify login status with Facebook, the website will send an automatic "request" to Facebook in an effort to confirm the user's login status with Facebook.

54.     Where a c_user cookie is active on a user's device, the website's verification "request" will forward the user's UID to Facebook.[10]

---

[9] *Facebook Joey?*, COMPUTERPASSION
https://www.computerpassion.com/info/tidbits/facebook-joey-in-url/ (last visited October 27, 2022).

[10] *HTTP cookies explained*, HUMAN WHO CODES
https://humanwhocodes.com/blog/2009/05/05/http-cookies-explained/ (last visited October 27, 2022).

55.    The inclusion of a user's UID in the "Request Header" is depicted, for example, in this image derived from a developer's console monitoring the verification "request" made by the NFL's Philadelphia Eagles web site:



56.    In addition to automatically issuing the "request" with a Facebook user's UID, website developers' "requests" to Facebook contain additional parameters embedded in the "request" URLs, which include the addresses of the web pages issuing the "requests" and the titles of video content viewed by the users.

57.    A URL, in addition to a domain name and path, will often contain parameters. Parameters are values added to a URL to transmit data and direct a web server to provide additional services, as depicted below:



*Figure 1 - Mozilla's diagram of a URL, including parameters[11]*

58.    The inclusion of the web page address and video content information is depicted below on the NFL's Philadelphia Eagles web site:

---

[11] What is a URL?, MOZILLA https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited October 27, 2022).

 

59.     The information sharing depicted above was derived from a developer's console monitoring the NFL's Philadelphia Eagles website and reflects what occurred as part of a "request" by the NFL to Facebook.

60.     The Facebook SDK, when used in the manner alleged here (the "SDK Login Verification") collects and transmits both video data and user information.

61.     A website that utilizes the SDK Login Verification, without obtaining clear consent from users, is in violation of the VPPA.

**b.     <u>The Facebook Pixel as a Tracking Method</u>**

62.     The Facebook Pixel (the "Pixel") tracks user-activity on web pages by monitoring events which,[12] when triggered, causes the Pixel to automatically send data directly to Facebook.[13]

---

[12] *Meta Business Help Center: About Meta Pixel*, FACEBOOK https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited October 27, 2022).
[13]*See generally Id.*

63.     Two examples of events utilized by websites, including the Team Websites, include a user loading a page with (i) "microdata" tags (the "MicroData event"),[14] or (ii) with a Pixel installed (the "PageView event").[15]

64.     The presence of Pixel events, such as the MicroData and PageView events, can be confirmed by using the Facebook Pixel Helper tool.

65.     As a means of confirming this traffic or activity, when a PageView and/or MicroData event is triggered, a request is sent to Facebook (through url www.facebook.com/tr/).[16]

66.     When a "c_user" cookie is in place, both the MicroData and PageView events read a user's c_user cookie and copy the c_user cookie into the HTTP header.

67.     Both the MicroData and PageView events, when triggered, independently and automatically result in the sharing a user's website interactions and Facebook UID with Facebook.

68.     In the Pixel, the parameters included in a request provide websites and Facebook with additional information about the event being triggered.[17]

69.     The parameters for a request, for instance, may include the title of a video being watched or the URL of the video, as depicted below:

---

[14] *Facebook Microdata Installing Schema*, CAT HOWELL https://cathowell.com/facebook-microdata-what-it-is-how-to-set-it-up/ (last visited October 27, 2022).

[15] *Meta Business Help Center: Specifications for Meta Pixel standard events*, FACEBOOK https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited October 27, 2022).

[16] *How We Built a Meta Pixel Inspector*, THE MARKUP https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited October 27, 2022).

[17] *Meta for Developers: Conversion Tracking*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited October 27, 2022).



*Figure 2 - PageView event firing, including video title and URL of video as parameters of URL request[18]*

70.    MicroData events are triggered whenever a web page containing MicroData tags is loaded.[19]

71.    MicroData tags allow developers to nest metadata within the contents of a web page.[20]

72.    This metadata may include the title of a video – for example, here, "og:title": "Browns Live: Traning Camp | Day 11" – on the Browns' website, as depicted below:

---

[18] *Run it Back*, LOS ANGELES CHARGERS https://www.chargers.com/video/run-it-back-2021-season-recap-highlights, (last visited October 27, 2022).

[19] *Facebook Microdata Installing Schema*, CAT HOWELL https://cathowell.com/facebook-microdata-what-it-is-how-to-set-it-up/ (last visited October 27, 2022).

[20] *Meta for Developers: Microdata Tags*, FACEBOOK https://developers.facebook.com/docs/marketing-api/catalog/guides/microdata-tags/ (last visited October 27, 2022).



*Figure 3 - MicroData Event sends MicroData tag for video's title to Facebook.*[21]

73.    When a MicroData event fires, it sends a request to Facebook containing data, including, but not limited to, the MicroData tags, as depicted in the developer's console "Payload" tab below:

---

[21] *Browns Live: Training Camp*, CLEVELAND BROWNS
https://www.clevelandbrowns.com/video/browns-live-training-camp-day-11 (last visited October 27, 2022).



*Figure 4 - MicroData Payload Tab Confirms Sending MicroData tags*[22]

74.    The PII and Video Watching Data of subscriber-users, including Plaintiffs and Class Members, have automatically been shared with Facebook in a consistent manner across all Team Websites.

**C.    Defendants' Build, Content-Creation, and General Uniformity of the Team Websites**

75.    The National Football League was founded in 1920, with ten teams from four states, and expanded to 32 teams by 2002.

76.    For years, NFL has promoted professional football teams, including promotions and fan engagement through the use of websites bearing the NFL' trademarks to persons and entities throughout the United States. This includes the Team Websites at issue.

77.    The Team Websites are designed to improve marketing outreach and engagement with fans of the Member Teams and act as the official source for NFL and Member Team news.[23]

---

[22] *Id.*
[23] NFL, www.nfl.com (last visited October 27, 2022).

78.     Defendants work with the Member Teams to operate the Team Websites. What's more, the operability of the Team Websites is reliant on the NFL – e.g., the content available on the sites is managed and hosted by the NFL.

79.     Each Team Website appears to be an individual site, completely separate from other Team Websites.  In practice, however, they all share the same source of information, the same media host, the same code developer, and the same trade association:  the NFL.

80.     The Team Websites share the same template.  The Team Websites may have slight variation, but they share the same source for content, including pre-recorded videos and the Tracking Methods.

81.     The HTML headers across the Team Websites, for example, use the same visual and coding design.[24]

82.     The header on the 49ers website, for example, includes a team banner and set of navigational links, with two groups of navigational menus on each side of the header, and large empty space between the two navigational menu groups, as depicted below[25]:



83.     This same visual design is applied in the headers on other Team Websites.  Exhibit A to this Complaint illustrates the matching banner design and branded-header.

---

[24] For example, an HTML header represents a container for introductory content or a set of navigational links. *See* *<header>*, MOZILLA https://developer.mozilla.org/en-US/docs/Web/HTML/Element/header (last visited October 27, 2022).
[25] SAN FRANCISCO 49ERS, www.49ers.com (last visited October 27, 2022).

84.     The 49ers header, at a coding level, labels the team banner as the "branded-header."  This can be confirmed by viewing the HTML for the 49ers website with an internet browser's developer's console (the "developer's console"), as depicted below:



85.     The use of a "branded-header" and associated organization and structure for all of the Teams Websites is identical among the Team Websites. The coding that labels the team banner as the "branded-header" for the remaining Member Teams is attached hereto as Exhibit B.

86.     The 49ers header, at a coding level, labels the navigational menu as the "nfl-c-header."  This can be confirmed by viewing the HTML for the 49ers website with the developer's console, as depicted below:



---
[26] *Id.*
[27] *Id.*

87.    The use of "nfl-c-header" is identical among the Team Websites.  Examples of the coding that labels the navigational menu as the "nfl-c-header" for the remaining Member Teams is included within Exhibit B.

88.    The Team Websites do not use unique coding terms named or linked to the team's name.  Instead, the Team Websites uniformly use the same "branded-header" and "nfl-c-header" design and coding scheme.

89.    The design similarities between the Team Websites include the use of the NFL-supplied and NFL-hosted "lazy" images, which provide black and white, blurred images, while web pages – including the Tracking Methods – load.



90.    This is only one example of uniform coding language used by the Team Websites, derived from the NFL.  The Team Websites all rely on the NFL to provide the NFL Application

Programming Interface ("API") for functionality, "which essentially provides a structured way for other computer applications to get NFL content and data in a predictable, flexible, and powerful way."[28]

91.     API is, in essence, an NFL-created tool to allow the Team Websites to communicate with NFL servers and gain access to the tools, coding and content needed to operate the Teams Websites.

92.     The Team Websites implement the NFL API to exchange data with the NFL.

93.     The content or assets viewable on the Team Websites (e.g., images, videos, logos, animated banners) are stored on NFL servers.

94.     The 49ers, for example, retrieve their animated branded-header from NFL servers static.clubs.nfl.com.  The 49ers do not host the branded-header animation locally.  This can be confirmed by observing the 49ers branded-header element with the developer's console, as depicted below:



---

[28] *See NFL Developer Portal: Get Started, An Introduction to the NFL Portal*, NFL https://developer.nfl.com/get-started/overview (last visited October 27, 2022).

95.    The use of "static.clubs.nfl.com" and of animated branded-headers is shared among the Team Websites.

96.    Even the 49ers' own logo is provided by, and hosted by, the NFL (static.www.nfl.com).  This can be confirmed by observing the 49ers nfl-c-header element with the developer's console, as depicted below:



97.    The source and hosting of teams' logos is the same among the Team Websites.

98.    The Team Websites reliance on NFL servers for access to provide media extends to press photos and videos that are specific to the Member Teams themselves.

99.    The 49ers, for example, uses a photo slide of promotional pictures hosted by NFL servers (static.clubs.nfl.com) related to 49ers news.  This can be confirmed by inspecting the 49ers' sources on its website with the developer's console, as depicted below:



100.    The Team Websites all rely on the NFL for access to even their own team-content to display on the Team Websites.

101.    Video content, and the associated Tracking Methods, are also supplied to the 49ers by the NFL.  Video is made available via the NFL API.  This can be confirmed by observing network requests made by the 49ers' Team Website via the developer's console, as depicted below:



---

[29] *Meet the Rookies*, SAN FRANCISCO 49ERS  https://www.49ers.com/video/49ers-meet-the-rookies-2022-what-is-your-pet-peeve (last visited October 27, 2022).

102.     In practice, this means when the Team Websites are visited by a user, the Team Websites request the assets from the NFL, which are subsequently loaded to users' computers.

103.     The Team Websites cannot deliver or load assets, including videos or images, to users without the NFL's consistent management, content development, and hosting as applied to the Team Websites.

**D.     Defendants Shared Plaintiffs' PII and Video Watching Data in Violation of the VPPA**

104.     Defendants violate the VPPA through its use of the Tracking Methods – specifically, tracking by and through Facebook – on its Teams Websites.

105.     The Tracking Methods allow Defendants to share a user's website usage data with Facebook, in conjunction with the user's Facebook UID, which allows for Facebook to develop better targeted advertising, among other business functions.

106.     Defendants' Team Websites implement the Tracking Methods which track Video Watching Data by identifying the name and location (via URL) of specific video content watched by Plaintiffs and Class Members, as well as the Plaintiffs' and Class Members' PII in the form of the Facebook UID through their c_user cookies.

107.     Below is a sample detailing how Defendants violate the VPPA on the Carolina Panthers website, through their use of the Tracking Methods.  Defendants also violate the VPPA on the remaining Team Websites using the Tracking Methods. Information pertaining to Defendants' like violations of the VPPA as applied to the remaining Team Websites is included in Exhibit C, attached hereto.

     **a.**     **The NFL, By Way of Example, Tracks Plaintiffs' Video Watching History and PII on the Carolina Panthers Website and Transmits the Data to Facebook**

108.    Akin to each of the Team Websites, the Carolina Panthers (the "Panthers") website implements the Tracking Methods.

109.    The Panthers website, during the relevant period, utilized both the Pixel and SDK.

110.    The Panthers website's use of the Tracking Methods were, and are, in violation of the VPPA.

111.    The Panthers website's use of the Pixel is depicted by:



*Figure 5 - Pixel events are active and confirmed by Facebook Pixel Helper*[30]

112.    The NFL utilized the same Pixel events for other Team Websites during the relevant time period.  A sampling of the Team Websites' identical use of the Pixel is reflected in Exhibit C (attached).

113.    The Panthers website's use of the SDK is depicted by:

---

[30]   *Featured Video: Thank you, Christian McCaffrey*, Carolina Panthers https://www.panthers.com/video/thank-you-christian-mccaffrey (last visited October 27, 2022).



*Figure 6 - Panthers' Login Verification Request URL Confirms SDK version Joey is active[31]*

114.    The NFL utilized the same SDK for other Team Websites during the relevant time period.  A sampling of the Team Websites' identical use of the SDK is reflected in Exhibit C (attached).

115.    The Panthers website uses the Tracking Methods to capture Plaintiffs' and Class Members' Facebook UID in the form of the c_user cookie, as described above in paragraphs 54, 55, and 66.

116.    The NFL uses the Tracking Methods to share the video watching data in two ways: (i) through the "request" URL parameters described above in paragraphs 56 through 58 and paragraphs 68 through 69; and (ii) through the MicroData tags shown to be active in paragraph 63, paragraphs 70 through 73, and Figures 3 and 4, which tracks, among other data, the title of the video.

117.    The Tracking Methods' use of "request" URL parameters to share the video title and URL of the location of the video is confirmed by using the developer's console to monitor the requests made by the Panthers' website to Facebook, as depicted by:

---

[31] *Id.*



*Figure 7 - Panthers' Use of Facebook Pixel to share video watching data through URL parameters[32]*

118.     The Same Tracking Methods, utilizing the same "request" process, was implemented by the NFL for its Team Websites.  A sampling of the Team Websites' identical use of the request process is reflected in Exhibit C (attached).

119.     Both the Pixel's PageView event and SDK use this "request" process to pass the video watching data to Facebook.

120.     The Tracking Methods' use of the SDK to share video watching data using "request" URL parameters is confirmed by using the developer's console to monitor the Login Verification request made by the Panthers website to Facebook, as depicted by:

---

[32] *Id.*



*Figure 8 - SDK's Login Verification Request includes video watching data in its request URL Parameters*[33]

121.    The same Tracking Methods, utilizing the same SDK toolset, was implemented by the NFL for its Team Websites.  A sampling of the Team Websites' identical use of the request method is reflected in Exhibit C (attached).

122.    The NFL's sharing of Class Members' Facebook UID occurs in a consistent manner across the Tracking Methods, resulting when an active c_user cookie exists on a device used to load the Panthers website, allowing the NFL to include the user's Facebook UID in its request header to Facebook.  This process is confirmed by using the developer's console to monitor the Panthers website requests to Facebook, as depicted by:

---

[33] *Id.*



*Figure 9 - Facebook Pixel Helper Lists Active Events[34]*

123.    The transmission of active c_user cookies follows the same, consistent, approach by the NFL for its Team Websites.  A sampling of the Team Websites' c_user cookie transmission is reflected in Exhibit C (attached).

124.    Both MicroData and PageView Pixel events send the collected information from the Panthers website to Facebook when triggered.

125.    When the Microdata event triggers on the Panthers website, the PII and video title are sent to Facebook through an automatic request made or delivered to www.facebook.com/tr/, as verified in paragraph 72 through 73, Figures 3 and 4, and through the developer's console depicted below:

---

[34] *Id.*



*Figure 10 - Panthers' use of MicroData request to send PII and Video Watching Data to Facebook[35]*

126.     When the "PageView" event triggers on the Panthers website, the video title and

PII are sent to Facebook through a request made to www.facebook.com/tr/, as verified in

paragraph 69, Figure 2 and through the developer's console depicted below:



---

[35] *Press Conferences: Steve Wilks gives injury updates, speaks on the QB position on Monday*, CAROLINA    PANTHERS    https://www.panthers.com/video/steve-wilks-gives-injury-updates-speaks-on-the-qb-position-on-monday (last visited October 27, 2022).

127.    The practice of having the PII and video titles sent to Facebook through an automatic request made or delivered to www.facebook.com/tr/ is consistent among the Team Websites.

128.    When either the MicroData or PageView events trigger (or both), the Facebook UID and title of the video is automatically sent to Facebook.

**E**.    **Sign-up for the Member Team Newsletters Lack Informed, Written Consent**

129.    The Team Websites do not seek nor obtain permission from their subscribers, including Plaintiffs and the Class, to share the subscribers' PII or video watching information with third-parties, including Facebook.

130.    The sign-up processes for the Team Websites' newsletters do not seek or obtain informed, written consent.

131.    To the extent information about any of the NFL's Team Website's data sharing can be located, the language (i) is not presented to users of the site in a transparent manner; (ii) is not made available as part of the sign-up process; and (iii) is not offered to users as checkbox or e-signature field, or as any form of consent.

132.    By way of example, the sign-up forms for the nine non-party teams appear as:

a.   **Carolina Panthers**[36]



b.   **Baltimore Ravens**[37]



---

[36] *Panthers Email Signup*, CAROLINA PANTHERS, https://www.panthers.com/email-signup (last visited October 27, 2022).

[37] BALTIMORE RAVENS, https://mail.baltimoreravens.com/p/7E8V-EI/subscribe (last visited October 27, 2022).

c.      **Cleveland Browns**[38]



d.      **Denver Broncos**[39]



---

[38] CLEVELAND BROWNS, http://info.clevelandbrowns.com/BrownsSignup (last visited October 27, 2022).

[39] *Email Subscriptions*, DENVER BRONCOS https://www.denverbroncos.com/e-news/ (last visited October 27, 2022).

e.      **Las Vegas Raiders**[40]



f.      **New England Patriots**[41]



---

[40] *Newsletters & Subscriptions*, LAS VEGAS RAIDERS https://www.raiders.com/tickets/newsletter (last visited October 27, 2022).
[41] *Email Newsletter Sign-Up*, NEW ENGLAND PATRIOTS https://www.patriots.com/fans/fanzone-newsletter-sign-up (last visited October 27, 2022).

g.    **New Orleans Saints**[42]



h.    **Philadelphia Eagles**[43]



---

[42]    *Sign Up For Saints News*, NEW ORLEANS SAINTS, https://www.neworleanssaints.com/news/email-newsletter (last visited October 27, 2022).
[43]    PHILADELPHIA EAGLES, https://fanpages.philadelphiaeagles.com/preferences?email=%22%22 (last visited October 27, 2022).

i.        San Francisco 49ers[44]



## F.    Plaintiffs Did Not Consent to Defendants' sharing of Plaintiffs' PII and Video Watching Data

133.    The VPPA sets out narrow guidelines as to the acceptable forms of consent that consumers can give to video tape service providers to share consumers' information.

134.    The VPPA limits video tape service providers' ability to share consumers' PII with third-parties, except where consumers provide "informed, written consent (including through an electronic means using the Internet) . . . in a form that is distinct and separate from any form setting forth other legal or financial obligations of the consumers."[45]

135.    Such consent must be at the election of consumers, and consumers must be clearly and conspicuously provided with an opportunity to withdraw consent from ongoing disclosures on a case-by-case basis.[46]

---

[44] Email Newsletter, SAN FRANCISCO 49ERS, https://www.49ers.com/fans/email-newsletter (last visited October 27, 2022).
[45] 18 USC 2710(b)(2)(B); 18 USC 2710(b)(2)(B)(i).
[46] 18 USC 2710(b)(2)(B)(ii); 18 USC 2710(b)(2)(B)(iii).

136.     While limited information regarding consumers can be shared (e.g., name and address) to third parties, this exemption only applies where video tape service providers give the consumer a clear and conspicuous opportunity to prohibit this disclosure and the disclosure does not identify the title, description, or subject matter of the audio-visual material.[47]

137.     Plaintiffs and Class Members did not consent to Defendants' Tracking Methods pursuant to the VPPA, as Plaintiffs were not asked to provide informed, written consent in a form a separate from other legal obligations.

138.     Additionally, Plaintiffs and Class Members are not given the opportunity to withdraw consent from ongoing disclosures on a case-by-case basis.

139.     Finally, Defendants provide titles, descriptions, or subject matter of audio-visual materials when sharing Plaintiffs' and Class Members' PII.

### CLASS ACTION ALLEGATIONS

140.     Plaintiffs bring this action individually and on behalf of the following Class:

> All persons in the United States with a subscription to an NFL Team Website that had their personal information improperly disclosed to Facebook through the use of the Tracking Methods (the "Class").

141.     Specifically excluded from the Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

---

[47] 18 USC 2710(b)(2)(D)

142.     Plaintiffs reserve the right to amend the Class definition above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

143.     This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

144.     Numerosity (Rule 23(a)(1)): At this time, Plaintiffs do not know the exact number of members of the aforementioned Class. However, given the popularity of Defendants' Team Websites, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

145.     Typicality of Claims (Rule 23(a)(3)): Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, subscribed to, and used, a Team Website to watch videos, and had their PII collected and disclosed by Defendants.

146.     Adequacy of Representation (Rule 23(a)(4)): Plaintiffs will fairly and adequately represent and protect the interests of the Class.   Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

147.     Superiority (Rule 23(b)(3)): A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the monetary damages suffered by individual Class members is relatively small, the expense and burden of individual litigation make it impossible for individual Class members to seek redress for the wrongful conduct asserted herein.  If Class treatment of these claims is not available, Defendants will likely continue their

wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

148. Commonality and Predominance (Rule 23(a)(2), 23(b)(3)): There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

    a. Whether Defendants collected Plaintiffs' and the Class's PII and Video Watching Data;

    b. Whether Defendants unlawfully disclosed and continues to disclose the PII and Video Watching Data of subscribers of the Team Websites in violation of the VPPA;

    c. Whether Defendants' disclosures were committed knowingly; and

    d. Whether Defendants disclosed Plaintiffs' and the Class's PII and Video Watching Data without consent.

149. Information concerning Defendants' Team Websites data sharing practices and subscription members are available from Defendants' or third-party records.

150. Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

151. The prosecution of separate actions by individual members of the Classes would run the risk of inconsistent or varying adjudications, and establish incompatible standards of conduct for Defendants.  Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

152.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

153.     Given that Defendants' conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

## COUNT I

**VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT**
**18 U.S.C. § 2710, *et seq*.**
**(On Behalf of Plaintiffs and the Class)**

154.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

155.     Plaintiffs bring this count on behalf of themselves and all members of the Class.

156.     The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

157.     Defendants violated this statute by knowingly disclosing Plaintiffs' and other Class members' personally identifiable information to Facebook.

158.     Defendants, through the Team Websites, engage in the business of delivering video content to subscribers, including Plaintiffs and the other Class members, and other users. The Team Websites deliver videos to subscribers, including Plaintiffs and the other Class members, by making those materials electronically available to Plaintiffs and the other Class members on the Team Websites.

159.    "Personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

160.    A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." 18 U.S.C. § 2710(a)(4).

161.    Defendants are "video tape service providers" because they create, host, and deliver hundreds of videos on its websites, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

162.    Defendants also solicit individuals to subscribe to the Member Team newsletters that advertise and promote videos and articles on the Team Websites.

163.    Plaintiffs and members of the Class are "consumers" because they subscribed to the Member Teams' newsletters. 18 U.S.C. § 2710(a)(1).

164.    Plaintiffs and the Class members viewed video clips using the Team Websites.

165.    Defendants disclosed to Facebook Plaintiffs' and the Class members' personally identifiable information. Defendants utilized the Tracking Methods to force Plaintiffs' web browser to transfer Plaintiffs' identifying information, like their Facebook ID, along with Plaintiffs' event data, like the title of the videos they viewed.

166.    Defendants knowingly disclosed Plaintiffs' PII, which is triggered automatically through Defendants' use of the Tracking Methods.  No additional steps on the part of the Defendants, Facebook or any third-party is required.  And, once the Tracking Methods' routine exchange of information is complete, the UID that becomes available can be used by any

individual to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]).  That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

167.     The VPPA provides that a videotape service provider may disclose personally identifiable information concerning a consumer as long as that person has provided "informed written consent . . . in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(A)(i).

168.     Plaintiffs and Class members did not provide Defendants with any form of consent—either written or otherwise—to disclose their PII to third parties.  Defendants (and the Member Teams themselves), however, failed to obtain "informed, written consent" from subscribers – including Plaintiffs and Class members – "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is soon." 18 U.S.C. § 2710(b)(2)(B)(i)-(ii).

169.     Defendants' disclosure of Plaintiffs' and Class Members' Video Watching Data and PII was not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendants' disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

170.     In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the

consumer's election." Defendants failed to provide an opportunity to opt out as required by the VPPA.

171.    On behalf of themselves and the Class, Plaintiffs seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendants to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

(a)     For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

(b)     For an order declaring the Defendants' conduct violates the statute referenced herein;

(c)     For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)     Entry of an order for injunctive and declaratory relief as described herein, including. But not limited to requiring Defendants to immediately (i) remove the Tracking Methods from the Team Websites or (ii) add, and obtain, the appropriate consent from subscribers;

(e)     For damages in amounts to be determined by the Court and/or jury;

(f)     An award of statutory damages or penalties to the extent available;

(g)    For Defendants to pay $2,500.00 to Plaintiffs and each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(h)    For pre-judgment interest on all amounts awarded;

(i)    For an order of restitution and all other forms of monetary relief;

(j)    An award of all reasonable attorneys' fees and costs and

(k)    Such other and further relief as the Court deems necessary and appropriate.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs demand a trial by jury of all issues so triable.

Dated: October 27, 2022                    **LEVI & KORSINSKY, LLP**

By: /s/ *Mark S. Reich*
Mark S. Reich (MR-4166)
Courtney E. Maccarone (CM-5863)
Gary I. Ishimoto (*pro hac vice* to be filed)
55 Broadway, 10th Floor
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Emails: mreich@zlk.com
        cmaccarone@zlk.com
        gishimoto@zlk.com

*Counsel for Plaintiffs*